IN THE UNITED STATES DISTRICT COURT
OF THE SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS

----------------------------------------------------- X

ETIENNE UZAC, DAVID ENWRIGHT,  :
WILLIAM DOVE, MYONG SOP SHIM,  :
JAEWON KIM, DONG-CHAN KIM,  :
AND JAMES KONG  :
                                            :
         Plaintiffs,  :    **COMPLAINT**
                                            :
   -against-  :    **CASE NO. 25-3573**
                                            :
DEV PRAGAD  :
                                            :
        Defendant.  :

----------------------------------------------------- X

       Etienne Uzac, David Enwright, William Dove, Myong Sop ("Maxwell") Shim, Jaewon ("Jason") Kim, Dong-Chan ("Benjamin") Kim, and James Kong (collectively, "Plaintiffs"), by their undersigned counsel, bring this Complaint against Dev Pragad ("Defendant") for breach of contract and specific performance.

## NATURE OF THE ACTION

1.  This case is about Dev Pragad, the man who stole Newsweek, and Mr. Uzac's fight to return the historic news brand to its rightful owners.

2.  It all began in August, 2013, when Mr. Uzac, the Chairman of innovative new media network IBT Media Inc. ("IBT Media," "IBT," or "International Business Times"), led a dedicated group of media founders and investors to form a joint venture ("Founder and Investor Consortium," "Consortium," or "Joint Venture") for the purpose of acquiring Newsweek.

1

3.  The Consortium succeeded in the Newsweek acquisition, and from August, 2013 until September, 2018, heavily invested in it.

4.  Then, in late 2018, Mr. Uzac encountered a period of personal adversity.  It is at this time that Pragad sprang into action as he tricked Mr. Uzac and the Joint Venture into, at least ostensibly, selling him the Newsweek assets.  Still, Pragad had agreed with the coventurers that internally amongst themselves they would co-own and co-manage the Newsweek assets for the benefit of the Joint Venture.

5.  At first, Pragad treated Newsweek according to his agreement with the members of the Joint Venture, reporting on a weekly basis to the coventurers about his management of the Newsweek assets on their behalf.  At times, he reported even more frequently.  This co-management of Newsweek took place from late 2018 until 2022, when Pragad disavowed his agreement with the members of the Joint Venture.

## PARTIES

6.  Etienne Uzac led the Joint Venture in the acquisition of Newsweek.  He is currently the President of IBT Media.  He is a citizen of Connecticut.

7.  David Enwright is a media entrepreneur, a Joint Venture member, and an investor in Newsweek.  David Enwright is a citizen of Connecticut.

8.  William Dove is a media entrepreneur and owner of NW Publishing UK Ltd.  He is a Joint Venture member, and an investor in Newsweek.  Mr. Dove is a citizen of the United Kingdom.

9.  Maxwell Shim is a Joint Venture member that invested in Newsweek.  Mr. Shim is a citizen of the United Kingdom.

10. Jason Kim is a Joint Venture member that invested in Newsweek. Mr. Kim is a citizen of the United Kingdom.

11. Benjamin Kim is a media entrepreneur and investor in Newsweek. Mr. Kim is a citizen of South Korea.

12. James Kong is a media and e-commerce entrepreneur and the Publisher of International Business Times, Australia. He is currently a citizen of the United Kingdom.

13. Defendant Pragad, an individual, is the Publisher of Newsweek. Pragad is a citizen of New York State. He is a resident of Westchester County, New York, and is domiciled in the Southern District of New York.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

15. There is complete diversity among the parties because each of the individual Plaintiffs is a citizen of a state other than New York, while Pragad is a citizen of New York State.

16. The amount in controversy exceeds $75,000.00 (exclusive of interest and costs) because the value of the Newsweek assets at issue in the case far exceed this amount.

17. This Court has general jurisdiction over Pragad because he is domiciled in the Southern District of New York, specifically, Westchester County.

18. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because defendant Pragad resides in this District.

## FACTUAL ALLEGATIONS

19. The Founder and Investor Consortium that acquired Newsweek comprised two groups—first, International Business Times founders and investors, and, second, Diakonos Club representatives.

20. The Consortium included the following 14 individuals:

- International Business Times founders and investors—
  - Etienne Uzac, Chairman and Chief Executive Officer
  - Johnathan Davis, Chief Content Officer
  - Maxwell Shim, Head of Web Technologies
  - Jason Kim, Senior IT Developer
  - Benjamin Kim, Director of Marketing
  - Younseok ("Titus") Choi, IT Developer
  - Moonsoo ("Martin") Jung, Director of Ad Operations
  - James Yang, IT Developer
  - Nancy Lee, Creative Director
  - Sylvia Lee, Lead Designer
- Diakonos Club representatives—
  - David Enwright, Owner of a digital media network
  - William Dove, Founder of International Business Times, United Kingdom

     ○ Winnie Wong, Founder and CEO of a Chinese media company

     ○ James Kong, Publisher of International Business Times, Australia

21. The International Business Times founders and investors were led by Mr. Uzac, a media entrepreneur with decades of experience in print and digital media and global business leadership, in building IBT into a modern digital business publication. IBT's mission is to seek out the truth and promote freedom through editorial coverage focused on the transforming global economy and its drivers. IBT Media was founded in 2006 and headquartered on Wall Street.

22. Mr. Uzac also developed and maintained extensive contacts with the Diakonos Club, a global association of business leaders adhering to a shared Christian faith designed to help Christian executives build successful companies that become a positive influence on society through ethical business practices and the spirit of giving.

23. Mr. Uzac was approached with the opportunity to acquire Newsweek from another large media conglomerate. Upon learning about the acquisition opportunity, Mr. Uzac used his network to put together the Consortium with the intent to make a serious bid for Newsweek.

24. The Consortium's members each orally agreed to a Joint Venture agreement ("Joint Venture Agreement," "Agreement," or "Supra Agreement"). The Agreement was simple. Should the Consortium succeed in its Newsweek bid, the assets of Newsweek would be held ostensibly in Newsweek LLC, a subsidiary to be created by IBT Media, but would be managed for the benefit of the Founder and Investor Consortium. The Newsweek brand and assets would be used to benefit the public

through the creation and promotion of truthful and accurate media reports about U.S. and global news issues. Profits from Newsweek would be shared with the Consortium members at an equal share. Losses would also be shared accordingly. Regular reports would be required by the Consortium from Mr. Uzac about the status of Newsweek, and no major decisions about the Newsweek brand or assets were to be made without a consensus from the Consortium members, and each individual held an equal share of the voting power of the joint venture. Although ostensibly the assets were to be held under IBT Media as a holding company, internally, it was agreed through the Joint Venture that the assets of the holding company would be owned and controlled in equal share by each of the 14 members of the Founder and Investor Consortium. Thus, the coventurers were in effect beneficial owners and effective controllers of the Newsweek assets, each in equal proportion to one another.

25. The Agreement among the coventurers also included the stipulation that should Mr. Uzac or IBT Media wish to leave the Joint Venture, the Newsweek assets would be returned to the Consortium for a nominal amount. At no time would Mr. Uzac be allowed to manage the Newsweek company solely for his personal gain, or to disassociate himself from the Consortium, without relinquishing control of Newsweek back to the remaining Consortium members.

26. Based on this Agreement, the Founder and Investor Consortium agreed to pool resources from their individual and business holdings, raising a then-undisclosed sum in the millions of dollars and joining together as a talented team of individuals

to lead a revamped Newsweek.  The media conglomerate was impressed by the Consortium's offer, and thus the Consortium succeeded in its bid for Newsweek. On August 3, 2013, the Founder and Investor Consortium officially acquired Newsweek.

27. Under its previous media conglomerate owner, Newsweek was losing both money and readers.  During and after the acquisition, the Founder and Investor Consortium directly and indirectly invested millions of dollars in Newsweek, envisioning a restored Newsweek focused on powerful journalism and the pursuit of truth to the benefit of U.S. and global society.  Mr. Uzac was entrusted by the Founder and Investor Consortium with Newsweek's leadership.

28. Mr. Uzac owned Newsweek on behalf of the Founder and Investor Consortium, via IBT Media as an ostensible holding company.  Internally, Mr. Uzac abided by the Joint Venture Agreement in his ownership and management of Newsweek.  He regularly reported to the Consortium members on the development of Newsweek. These reports were often given at least weekly, and at times, even more frequently.

29. At all times, from the date of his appointment as Newsweek's leader, it was understood by Mr. Uzac that he would not personally sever ties with the Founder and Investor Consortium while retaining Newsweek ownership.  At all times, it was understood by Mr. Uzac that were he to personally sever ties with the Founder and Investor Consortium, he would return Newsweek to the Founder and Investor Consortium, or a designated individual member thereof, on demand, for a nominal price.

30. From 2013 to 2022, Mr. Uzac and the Founder and Investor Consortium heavily invested in the Newsweek brand. The Founder and Investor Consortium invested sweat equity into Newsweek, and contributed significant time, talent, and intellectual capital to Newsweek from 2013 until 2022.

31. Many of the Founder and Investor Consortium members received little to no payment from Newsweek in return for their significant investments. Some of them forewent salary or bonus payments to prioritize the Founder and Investor Consortium's heavy investments in Newsweek, expecting significant future return on their investments.

32. The Founder and Investor Consortium worked together with Mr. Uzac in hope that Newsweek would significantly benefit the U.S. and global public through its pursuit of truth.

33. By 2013, the Founder and Investor Consortium led by Uzac had already taken over Newsweek's physical office space, a Class AAA office which took up one whole floor in a high rise office building in Manhattan's Financial District.

34. At the time of the acquisition, Newsweek.com was defunct because under its former owners, Newsweek did not have a website of its own. Starting from scratch, the Founder and Investor Consortium led by Uzac envisioned, designed, created, and launched Newsweek.com in 2013.

35. At the time of the acquisition, Newsweek's print business had been shuttered. Beginning from scratch, the Founder and Investor Consortium led by Uzac brought Newsweek back into print.

36. Also in 2013, the Founder and Investor Consortium led by Uzac recruited top-tier management and journalism talent to lead Newsweek.com and Newsweek's print edition.

37. Later in 2013, the Founder and Investor Consortium led by Uzac began licensing the Newsweek brand globally.

38. From 2013, Newsweek began to grow significantly through the use of proprietary technologies originally developed by International Business Times and other members of the Founder and Investor Consortium that gave Newsweek a significant edge in digital and print publishing.

39. From 2013 to 2016, Newsweek's readership grew significantly under the capable leadership of Mr. Uzac, with the extensive support of the Founder and Investor Consortium.

40. Meanwhile, Pragad, a media worker raised by Uzac as an IBT manager in the United Kingdom, was called to America for work.  But beginning as early as June 2016, Pragad began confiding to Founder and Investor Consortium members about his hatred for Mr. Uzac, and disdain for Mr. Uzac's leadership.

41. Also in 2016, Mr. Uzac encountered a period of personal adversity.

42. Around this time, Jihee ("Sophia," or "Sophie") Yu, then wife of a former Diakonos Club member, herself severed ties with the Diakonos Club due to family struggles.

43. Yu, hysterical about her family struggles, took out her hostilities on Diakonos Club members and members of the Founder and Investor Consortium.  In late 2016, Yu

instigated a Manhattan District Attorney ("Manhattan DA," or, "DA") investigation against Mr. Uzac.

44. This investigation led to a period of personal adversity for Mr. Uzac, as he was an initial target of the investigation instigated by Yu.

45. Mr. Uzac's personal adversity, as he faced this investigation and its legal ramifications, lasted from 2016 to 2020.

46. In 2018, at a time when Mr. Uzac was under peak duress, only days before a criminal indictment was expected to be handed down from the Manhattan DA's office against Mr. Uzac, Pragad approached several members of the Founder and Investor Consortium and nominated himself as a replacement for Mr. Uzac's leadership at Newsweek.

47. The members of the Founder and Investor Consortium were reluctant to accede to Pragad's request. Specifically, several members were concerned about Pragad's apparent greed, and were doubtful that Pragad would manage the Newsweek assets for the benefit of the Joint Venture, per the Joint Venture Agreement. Some compared Pragad to Gollum from the Lord of the Rings, a monster obsessed with The One Ring.

48. From the date of the Newsweek acquisition, the Founder and Investor Consortium never intended for the ownership of Newsweek to benefit a single individual—for instance, Pragad. Rather, Newsweek was to be entrusted to an owner that would manage it for the good of the Joint Venture, with the purpose of the pursuit of truth via media.

10

49. Pragad convinced the Founder and Investor Consortium to accept Pragad's proposed leadership change by falsely representing to the consortium members that one or more Assistant District Attorney at the Manhattan DA's office had stated to Pragad's legal team that the Manhattan DA's office would like Pragad to take over Newsweek leadership. Pragad told Founder and Investor Consortium members that the transfer of Newsweek to himself would reduce the "heat" on Mr. Uzac. Thus, such a transfer would benefit Mr. Uzac and each Joint Venture member, according to Pragad's falsehood.

50. Pragad's representation was fictional, designed solely to fraudulently induce members of the Founder and Investor Consortium to assent to his takeover of Newsweek. Only years later, on or about November 14, 2023, did Mr. Uzac and the Founder and Investor Consortium discover from a colleague that had been in contact with the lead Assistant District Attorney assigned to the DA case that no one at the DA's office had ever made such a representation to Pragad.

51. The Founder and Investor Consortium, falsely induced by Pragad through his falsification of one or more government official's testimony, was convinced to entrust Pragad with Newsweek leadership.

52. Pragad, in turn, agreed with the Consortium to enter the Joint Venture on equal terms as the other coventurers, further agreeing to the terms of the Supra Agreement under the same original terms as Mr. Uzac and the others. The Joint Venture and Pragad agreed to form a new company, NW Media Holdings Corp., to ostensibly hold the Newsweek assets (i.e., Newsweek LLC and several other

Newsweek-related entities under the new holding company), which would continue to be managed by Pragad for the benefit of the Joint Venture.

53. The Founder and Investor Consortium would not allow Pragad to take 100% of the holding company ostensible ownership due to serious concerns about his greed. Therefore, the Founder and Investor Consortium insisted that former International Business Times editor, Johnathan Davis, share the management of Newsweek with Pragad, splitting the ostensible ownership of NW Media Holdings Corp. at 50% each. However, internally among themselves, it continued to be understood by all parties that the Newsweek assets belonged to the Joint Venture, with an equal share allotted to each coventurer.

54. At all times during the discussions between Pragad and the Founder and Investor Consortium about Pragad's potential role in Newsweek, it was understood by Pragad and the Founder and Investor Consortium that Pragad would only be temporarily entrusted with Newsweek.

55. Pragad understood that he would own Newsweek externally on behalf of the Founder and Investor Consortium only per the internal Supra Agreement. He understood that no asset transfer would be made of the Newsweek assets except on the condition that he personally agreed to all of the Supra Agreement terms and that his personal acquiescence to the Supra Agreement terms was material to any agreement for a Newsweek asset transfer to NW Media Holdings Corp. to take place in the first place. While the Newsweek assets themselves were unencumbered by

the Agreement, Pragad was personally bound to adhere to the Supra Agreement and to manage NW Media Holdings Corp. accordingly..

56. Pragad understood that he would not personally sever ties with Mr. Uzac or the Founder and Investor Consortium while retaining the privilege of ostensible Newsweek ownership. Pragad understood that were he to personally sever ties with Mr. Uzac or the Founder and Investor Consortium, he would be bound by the internal Joint Venture Agreement to personally return his share of the Newsweek assets to Mr. Uzac or to the Founder and Investor Consortium, on demand, for a nominal price, and to relinquish his position as ostensible owner of NW Media Holdings Corp.

57. Pragad was amenable to the terms of the Supra Agreement with the Founder and Investor Consortium and to join the Joint Venture. Based on Pragad's amenability to the arrangement, members from the Founder and Investor Consortium contacted Mr. Uzac to request an ownership transfer of the Newsweek assets to the new ostensible holding company formed by Pragad.

58. Mr. Uzac understood the arrangement as proposed by the Founder and Investor Consortium about the deal between himself, the Founder and Investor Consortium, and Pragad. Soon after, while relying on Pragad's representations, and with the agreement of the Founder and Investor Consortium, Mr. Uzac acceded to Pragad's idea to create legal paperwork to document the asset transfer for a nominal price. Pragad, seizing this opportunity, eagerly and aggressively drew up these legal papers. Pragad did so using his own attorneys, at his sole direction, without Mr.

Uzac's input whatsoever.  Further, Pragad induced Mr. Uzac to have a lawyer do a cursory review for Mr. Uzac in order to make the transaction appear as arms length, which caused Mr. Uzac, at that time under great duress, to instruct his attorney to "not worry" because the transaction was to be "friendly."  The price did not reflect the market value of the Newsweek assets.

59. While working on the documentation for the asset transfer in September 2018, Pragad continued making his fictional representation that the asset transfer of Newsweek was expressly requested by the Manhattan DA's office.  He made this false representation to Mr. Uzac, members of the Founder and Investor Consortium, and to his lawyer for the transaction.

60. Thus, based on Pragad's intentional misrepresentations and active fraudulent inducement, Pragad's agreement with Mr. Uzac and the Founder and Investor Consortium culminated on September 13, 2018, when Mr. Uzac signed documentation transferring the Newsweek assets to Pragad at a nominal price.  The latter became a purported owner of Newsweek, temporarily and ostensibly, on behalf of the Founder and Investor Consortium.  Internally among themselves, the coventurers understood that they each still retained an equal share of the Newsweek assets, which were then divided among several smaller companies, each owned ostensibly by NW Media Holdings Corp.

61. To be sure, upon agreement to the terms of the Supra Agreement, Pragad waived any legal right to retain permanent Newsweek ownership; he waived any legal right to retain Newsweek ownership should he sever ties with Mr. Uzac or the Founder

and Investors Consortium; and he agreed that should such ties be severed, he would personally return Newsweek to Mr. Uzac or the Founder and Investor Consortium, on demand, for a nominal price. At all times before, during, and after the asset transfer, it was understood that Pragad owned Newsweek only ostensibly, on behalf of the Founder and Investor Consortium. His ostensible ownership of Newsweek was not to negatively affect any third-party creditors.

62. This was also the understanding of Johnathan Davis, who stated in a voice recording after the transfer of Newsweek assets by Mr. Uzac that neither he, Davis, nor Pragad were the true owners of Newsweek, despite each of their temporary ownership on paper.

63. As the investigation initiated by Sophia Yu continued, Pragad and Yu connected and forged strong ties due to a mutual shared hatred of Uzac and other Consortium members. This connection was only discovered years later by Founder and Investor Consortium members through a pattern of hostile and illegal activity aimed at the Founder and Investor Consortium directly linking Pragad and Yu, and through instant messages in which Yu referenced a firsthand knowledge of Pragad's intentions.

64. The investigation initiated by Yu settled in early 2020 with a guilty plea by Mr. Uzac.

65. Later in 2020, Yu divorced her husband, the former Diakonos Club member.

66. From 2016 to 2022, Pragad continued to express his hatred for Mr. Uzac and disdain for Mr. Uzac's leadership to Founder and Investor Consortium members and their colleagues.

67. Specifically, in November 2019, when Founder and Investor Consortium member William Dove visited the United States, Pragad confided in Mr. Dove about Pragad's hatred for Mr. Uzac.  Pragad made repeated statements to Mr. Dove to this effect.

68. Beginning in January, 2022, Pragad sent messages that alarmed the Founder and Investors Consortium and alerted the consortium that Pragad potentially planned to completely sever ties with Mr. Uzac and the consortium and renege the Supra Agreement.

69. From January to February 2022, the Founder and Investor Consortium suspected that Pragad's leadership was shaking and that he could no longer represent the Consortium or be entrusted with Newsweek on the Consortium's behalf.

70. Beginning in January, the Founder and Investor Consortium repeatedly asserted to Pragad that Newsweek did not belong to him, and reminded him that the original Joint Venture Agreement entrusting Newsweek assets to his ostensible holding company hinged on the condition that he not sever ties with the Founder and Investor Consortium, and that should he do so, he had agreed to return Newsweek to Mr. Uzac or the Consortium on demand, for a nominal price.

71. On February 28, 2022, the Founder and Investor Consortium began a leadership transition from Pragad to Mr. Uzac by reinstating Mr. Uzac, who was now fully recovered from his personal adverse situation, as the Consortium's primary representative.  Pragad opposed and resisted this reinstatement.

72. Around this time, Mr. Uzac learned that Pragad likely intended to sever relations with the Founder and Investors Consortium. Mr. Uzac had the shocking realization that Pragad intended to steal Newsweek.

73. Between January and April, the Founder and Investor Consortium urged Pragad to return Newsweek to either Mr. Uzac or the Founder and Investor Consortium, per the Agreement.

74. During this time, Pragad sought the Founder and Investor Consortium's permission to break his Agreement with the Consortium that required Pragad's return of Newsweek to Mr. Uzac, or to the Founder and Investor Consortium, or to Mr. Uzac on behalf of the Founder and Investor Consortium, upon demand, and for a nominal price.

75. Pragad's requests for permission to violate or renegotiate his Agreement with Mr. Uzac and the Founder and Investor Consortium were well-documented through text messages sent by Pragad to various members of the Founder and Investor Consortium, and their colleagues.

76. Members of the Founder and Investor Consortium repeatedly denied Pragad's requests to breach the Agreement, but instead urged him to keep his promise to return Newsweek to the Founder and Investor Consortium or to Mr. Uzac on the Consortium's behalf, should he decide to sever ties with the Consortium.

77. In April, 2022, Pragad officially severed the relationship with Mr. Uzac and the Founder and Investor Consortium, claiming Newsweek belonged to Pragad himself.

78. Pragad's breach of his Agreement with Mr. Uzac and the Consortium was confirmed by a Newsweek article published on August 10, 2022 that publicly declared Pragad severed ties with the Founder and Investor Consortium in April, 2022.

79. Soon after, Pragad began using Newsweek to attack Mr. Uzac, members of the Founder and Investor Consortium, and their colleagues.

80. Pragad paid himself millions of dollars in salary and bonuses, without the necessary consent, increasing his personal assets and diminishing the assets of Newsweek.

81. Pragad consistently attacked Johnathan Davis, causing Davis to turn against the Consortium and sever ties with the Consortium.

82. Pragad's attacks on Founder and Investor Consortium members and their colleagues continue to this day, in 2025.

83. Meanwhile, Mr. Uzac and the Founder and Investor Consortium, seeing the damage created by Pragad's greed, betrayal, theft, and abuse related to Newsweek assets, and wishing to prevent the potential for such abuse in the future, created a Delaware trust with no beneficiary owners in order to hold media assets.

84. The Delaware trust holds media assets that are to be used for the public benefit.

85. Mr. Uzac is the Grantor of the Delaware trust.

86. Mr. Uzac and the Founder and Investor Consortium intend to put the Newsweek assets into this trust to ensure it is used for the public good, and not private gain.

87. By and through this lawsuit, Mr. Uzac prays for the Court to grant specific performance of the Agreement between Pragad, Mr. Uzac, and the Joint Venture,

with the Court compelling transfer of Newsweek assets to Mr. Uzac, the Founder and Investor Consortium, or the Delaware trust.

88. Placing Newsweek into a perpetual Delaware trust with no beneficial owners will ensure that Pragad, or others, are forever prevented from illegally interfering with Newsweek's noble mission to pursue truth through journalism.

## FIRST CAUSE OF ACTION
## BREACH OF CONTRACT – SPECIFIC PERFORMANCE

89. The Plaintiffs incorporate by reference paragraphs 1 through 88 and re-allege them as if set forth fully herein.

90. The Plaintiffs entered into a valid, binding, and enforceable Joint Venture Agreement as outlined above.

91. The Joint Venture Agreement may be specifically enforced.

92. The Plaintiffs substantially performed their obligations under the contract.

93. The Agreement requires Pragad to share the Newsweek assets in equal proportion with each of the coventurers, and to sell Newsweek to the coventurers for a nominal price since he broke ties with the Consortium.

94. Pragad is able and has the means, authority, and power necessary to complete the aforementioned contractual obligations.

95. There is nothing preventing Pragad from completing the aforementioned contractual obligations.

96. Pragad has voluntarily, and of his own free will, chosen not to complete the aforementioned contractual obligations, and thus materially breached the Agreement.

97. For all the aforementioned reasons, Plaintiffs are entitled to an order directing Pragad to specifically perform the aforementioned contractual obligations.

98. Specific performance is the only adequate remedy available to Plaintiffs because Newsweek is unique and there is no suitable substitute for Newsweek.

**SECOND CAUSE OF ACTION**
**RESCISSION**

99. The Plaintiffs incorporate by reference paragraphs 1 through 88 and re-allege them as if set forth fully herein.

100. The Plaintiffs entered into a valid, binding, and enforceable Joint Venture Agreement as outlined above.

101. Plaintiffs agreed to give Pragad ostensible ownership of the Newsweek assets in full consideration for the Joint Venture Agreement.

102. Pragad agreed to manage the Newsweek assets on behalf of the coventurers in full consideration for the Joint Venture Agreement.

103. Pragad materially and substantially breached the Joint Venture Agreement. Furthermore, through Pragad's fraud and deceitful conduct the Joint Venture Agreement was entered into through deceit.

104. Pragad's breach was material and willful and substantially defeats the Plaintiff's purpose for making the Joint Venture Agreement because the Joint Venture members would never have entered into the Agreement or transferred the assets to Pragad if not for his deceit, and without his promise to share the benefits of the Newsweek assets with the Joint Venture members.

105. Plaintiffs justifiably relied to their detriment on the material misrepresentations of fact made by Pragad.

106. Mr. Uzac was compelled to agree to the contract terms under duress because of wrongful conduct by Pragad, with Pragad taking advantage of Mr. Uzac during a period when Mr. Uzac experienced deep personal adversity.

107. The Plaintiffs cannot obtain the benefits provided for in the Joint Venture Agreement from a party or source other than Pragad.

108. Plaintiffs hereby offer to restore and return to Pragad all consideration that Plaintiffs received from Pragad by virtue of the contract and demands that Pragad do the same.

109. Pragad rejected the Plaintiffs' offers to rescind the Joint Venture Agreement and to restore and return to Pragad all consideration received by Plaintiffs by virtue of the Joint Venture Agreement.

110. Plaintiffs is fully within its contractual and legal rights to bring this action for rescission of contract.

111. The parties can be restored and returned to their precontract status.

112. There is no other complete and adequate remedy at law.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, the Plaintiffs pray this Court enter orders as follows:

1. On the First Cause of Action for Breach of Contract, an Order directing Pragad to specifically perform his obligations under the Joint Venture Agreement.

2.  Alternatively, on the Second Cause of Action for Recission an Order rescinding the Joint Venture Agreement on whatever terms may be just, including restoration of all consideration given by Plaintiffs to Pragad by virtue of the contract.

3.  Awarding the Plaintiffs such other and further relief as this Court may deem just and proper.

Dated: April 29, 2025

Respectfully submitted,
By: _/s/ Yen-Yi Anderson_
Yen-Yi Anderson
New York Bar No. 5096268
Anderson and Associates
61 Broadway, Suite 2809
New York, NY 10006
Tel: (646) 201-9117
Email: y.anderson@aalawpc.com

Attorney for Plaintiffs